IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Genesis Insurance Company,                  :

        Plaintiff,                          :

v.                                          :    Case No. 2:05-cv-0401

Ahmed O. Alfi, et al.,                      :    JUDGE SARGUS

        Defendants.                        :

<u>OPINION AND ORDER</u>

On April 21, 2005, Genesis Insurance Company ("Genesis") filed a complaint against the former directors and/or officers of SmarTalk Teleservices, Inc. ("SmarTalk") in order to recover certain costs advanced to those officers and directors in connection with securities class action lawsuits. Three defendants, Ahmed O. Alfi, Robert H. Lorsch, and Richard M. Teich (collectively referred to in this opinion as "the defendants" even though there are other defendants in this case), filed motions to dismiss for lack of personal jurisdiction or, in the alternative, forum non conveniens, and improper venue. Further, the three defendants claim that if this Court does have jurisdiction, the claims against them should be transferred to California. For the following reasons, the defendants' motions to dismiss for lack of personal jurisdiction or, in the alternative, forum non conveniens, and improper venue will be denied. Additionally, the defendants' motions to transfer will be denied.

I.

Procedurally, the jurisdictional question has been presented to the Court by way of a motion to dismiss. Each party has supported its respective motion or response with additional evidence, including affidavits and documents. It is Genesis' burden to show that personal jurisdiction exists. <u>Compuserve v. Patterson</u>, 89 F.3d 1257, 1261-62 (6th Cir. 1996). However, as here, where no evidentiary hearing is held on the jurisdictional issue, "the Court must consider the pleadings and affidavits in a light most favorable to the plaintiff" and the plaintiff "need only

make a *prima facie* showing of jurisdiction." Id., citing Theunissen v. Matthews, 935 F.2d 1454, 1458-59 (6th Cir. 1991). The Court will analyze the parties' factual submissions in accordance with these guiding principles.

II.

SmarTalk was a California corporation that had its original principal place of business in California. In the spring of 1998, it relocated its principal place of business to Dublin, Ohio. Around that same time period, SmarTalk purchased directors and officers liability insurance through Genesis to insure against certain types of claims brought against SmarTalk's officers and directors. From 1997 to 1999, the two policies that SmarTalk purchased from Genesis were identified as "Policy 1317A" and "Policy 1751."

Beginning in 1998, securities fraud lawsuits were filed in federal and state courts in California, Ohio, and New York against SmarTalk and its individual officers and directors. The Judicial Panel of Multidistrict Litigation ordered all of the federal litigation to be transferred to the United States District Court for the Southern District of Ohio, and, following the transfer, all of the securities fraud cases were consolidated into a class action lawsuit.

Additionally, in both 1998 and 1999, SmarTalk was notified by the Securities and Exchange Commission that the SEC was conducting an informal inquiry to determine whether violations of the federal securities law occurred. SmarTalk requested coverage from Genesis, but Genesis denied its request, stating that the SEC investigation was not a "claim" as defined in the policy.

The SEC subsequently expanded the SmarTalk investigation by issuing an "Order Directing Private Investigation and Designating Officers to Take Testimony." The SEC order mandated that a private investigation be conducted to determine whether any persons related to SmarTalk had violated federal securities laws. SmarTalk again requested coverage from Genesis to pay for defense costs associated with the SEC investigation. Genesis defined coverage but stated:

> Genesis is prepared to treat certain fees expended in responding to the SEC subpoenas as costs of defense in connection with the securities litigation, subject to the following conditions:

2

> 1. Genesis is not making an open-ended commitment in connection with the SEC investigation.  Rather, Genesis is prepared only to advance fees in connection with SEC subpoenas on a case by case basis.  Advances shall not constitute a waiver of Genesis's right in connection with the SEC investigation.  Genesis continues to reserve all rights under the policies and applicable law in connection with that investigation.
>
> 2. All advances shall be made subject to the terms of the Agreement Regarding Advancement of Defense Costs (the "Agreement").  If advances are to be made on behalf of someone who is not a signatory to that agreement, we must first receive a signed undertaking from such individual stating that he or she has read the Agreement and that, in consideration of any advances, he or she agrees to be bound by its terms, and the terms of this letter.

Letter from Genesis to SmarTalk, April 15, 1999 at pp. 1-2.  As a result of this offer, Genesis funded the SmarTalk directors and officers with money to cover fees associated with the SEC subpoenas.

In 2003, the securities class action defendants requested Genesis to assist in funding an $11.10 million settlement for all the securities litigation.  Despite the fact that Genesis disputed whether SmarTalk's insurance policies covered the settlement, Genesis paid a portion of the settlement with the  agreement and understanding that Genesis reserved the right to seek recoupment from the defendants, who included SmarTalk officers and directors, for any amount paid to fund the settlement.

The securities class action defendants agreed to Genesis' right to recoupment and subsequently entered into a Memorandum of Understanding ("MOU") with Genesis

> that expressly provided that Genesis's funding of a settlement of the State and Federal Securities Litigation was "subject to a full and complete reservation" by Genesis under the "Genesis Policies and Applications, the Agreement Regarding Advancement of Defense Costs (and any addendum or modification thereto) between Genesis and the Directors/Officers, and applicable law, to seek recoupment from the Director/Officers of the settlement payment and all defense costs advanced by" Genesis "in connection with the Securities Class Action and the [SEC Investigation]."

Complaint at ¶41, citing the MOU. The MOU defined "recoupment" to mean "recovery from the Directors/Officers of amounts paid by the Carriers on the Directors/Officers' behalf on the grounds that such amounts were not and are not covered under the [Genesis] Policies." MOU at ¶5.

Further, Genesis entered into a Side Agreement Relating to Memorandum of Understanding Concerning Funding of Securities Class Action Settlement ("Side Agreement") with Mr. Alfi and Mr. Lorsch. The complaint states:

> Genesis, Alfi, and Lorsch agreed, among other things, that if "Alfi and Lorsch each pay Genesis One Hundred Sixty-Six Thousand Six Hundred and Sixty-Seven Dollars ($166,667.00)[by wiring such sum to Genesis no later than three days prior to the time Genesis funds its share of the Securities Class Action Settlement by placing funds in escrow], Genesis will not hold and/or seek to hold Alfi and Lorsch jointly liable with the Other Directors/Officers for any amount owed Genesis pursuant to Genesis's Recoupment Rights.... Instead, Genesis will only hold and/or seek to hold Alfi and Lorsch severally liable for any amounts owed Genesis pursuant to Genesis's Recoupment Rights."

Complaint at ¶43, citing the Side Agreement.

In July 2003, Genesis paid $5.35 million from Policy 1751 into escrow to help fund the $11.10 million settlement. Genesis also paid approximately $9.0 million in defense costs from Policy 1317A in connection with the state and federal securities litigations and the SEC investigation. Additionally, Mr. Alfi and Mr. Lorsch each paid Genesis $166,667.00 pursuant to the Side Agreement.

In April 2005, Genesis filed a complaint seeking, *inter alia*, a declaratory judgment ordering that (1) the state and federal securities litigation are excluded from coverage under Policy 1751; (2) the SEC investigation was not covered under Policy 1317A; and (3) the defense costs associated with state and federal securities litigation are not covered under Policy 1317A. Additionally, Genesis is seeking to recover the $5.35 million it paid to the settlement under Policy 1751 and the MOU, as well as the defense costs it paid for the SEC Investigation and the state and federal securities litigation. Mr. Alfi, Mr. Lorsch, and Mr. Teich filed motions to dismiss arguing primarily that this Court lacks personal jurisdiction over them. In the alternative,

4

Mr. Alfi, Mr. Lorsch, and Mr. Teich argue *forum non conveniens* and improper venue, and they propose the transfer of the case to California in the event that the Court concludes that outright dismissal is not warranted. This Court will begin with the personal jurisdiction analysis.

III.

      In diversity cases, federal courts apply the law of the forum state to determine whether personal jurisdiction exists. LAK, Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1298 (6th Cir. 1989). "Jurisdiction may be found to exist either generally, in cases in which a defendant's 'continuous and systematic' conduct within the forum state renders that defendant amendable to suit in any lawsuit brought against it in the forum state, or specifically, in cases in which the subject matter of the lawsuit arises out of or is related to the defendant's contacts with the forum." Nationwide Mutual Ins. v. Tryg International Ins. Co., 91 F.3d 790, 793 (6th Cir. 1996)(internal citations omitted). A successful assertion of personal jurisdiction must satisfy both the state long-arm statute, Ohio Revised Code §2307.382, and constitutional due process. Reynolds v. International Amateur Athletic Fed'n, 23 F.3d 1110, 1115 (6th Cir. 1994). Although the Ohio Supreme Court has held that the Ohio long-arm statute was not intended to grant jurisdiction over nonresidents to the full extent allowed by the Due Process Clause, see Goldstein v. Christiansen, 70 Ohio St.3d 232 (1994)(per curium), the Court of Appeals has "consistently focused on whether there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend 'traditional notions of fair play and substantial justice.'" Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002), quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); see also Cole v. Mileti, 133 F.3d 433, 436 (6th Cir. 1998)(addressing constitutional due process rather than focusing on the reach of jurisdiction under the Ohio long-arm statute). This Court will therefore focus on the same questions.

Facts Relating to Jurisdiction

      This Court notes that Genesis is a Connecticut corporation with its principal place of business in Stamford, Connecticut. However, Genesis maintains an affiliate, Genesis Professional Liability Managers ("Genesis PLM") in Beachwood, Ohio. Genesis PLM is the "home office for all of Genesis' directors and officers liability and employment practices liability

5

insurance lines. The Ohio office handles all claims and a significant portion of all underwriting for directors and officers liability insurance policies issued by Genesis." Aff. of Martin G. Hacala, Vice President of Genesis PLM at ¶4. The Ohio office "underwrote the directors and officers liability insurance policies at issue in this litigation, authorized their issuance to SmarTalk Teleservices...and handled all claims submitted under the policies." Id.

SmarTalk retained Picton Cavanaugh, Inc. ("Picton"), a Toledo, Ohio firm, to obtain the insurance policies at issue in this case. Through several communications, Picton sent Genesis PLM a renewal application and requested proposal for pricing for Directors and Officers Liability Insurance Policy 1317A, which was signed by Mr. Lorsch. Picton also assisted SmarTalk in obtaining Directors and Officers Liability Insurance Policy 1751 by sending the application to Genesis PLM, which was also signed by Mr. Lorsch. Policy 1317A and Policy 1751 both provide that all notices to Genesis "shall be sent to Genesis Insurance Company, D&O Liability Program...Beachwood, Ohio...." Id. at ¶9.

As a result of the state and federal securities litigation, Mr. Alfi, Mr. Lorsch, and Mr. Teich, as well as their attorneys, were in constant contact with Genesis PLM. According to Mr. Hacala,

> [f]rom approximately September 1, 1998 through October 1999, attorneys from the law firm of Wilson Sonsini, who represented Lorsch, Teich, Alfi and the other Securities Class Action Defendants in the Ohio class action and other underlying lawsuits, sent letters to Genesis in Ohio on at least fifteen separate occasions to provide notice of new lawsuits that were being filed against the defendants and tender claims for coverage on their behalf. On the following occasions, among others, Genesis received communications from attorneys representing Lorsch, Teich, Alfi, and the other Securities Class Action defendants to provide notice of new lawsuits filed against them and tender claims for coverage on their behalf....
>
> ***
>
> In or about February 1999, Wilson Sonsini attorney Keith Eggleton contacted me in Ohio to request that Genesis advance defense costs in connection with the Ohio securities litigation and State securities litigation. Although Genesis issued a strong reservation of its

6

rights to deny coverage for the underlying litigation, I discussed with Mr. Eggleton the possibility of Genesis advancing defense costs to the defendants subject to a reservation of its right to recoup those costs directly from the individual defendants. ***

Later that month, Mr. Eggleton contacted me at Genesis in Ohio to discuss the terms of the advancement agreement. Between March and April 1999, the Security Class Action Defendants executed the Agreement Regarding Advancement of Defense Costs with Genesis. *** I executed the Agreement on behalf of Genesis in Ohio. Defendants' counsel forwarded the defendants' executed signature page to me at Genesis in Beachwood, Ohio.

***

Thereafter, defendants' counsel contacted me in Ohio and informed me that SEC expanded its investigation....

***

On or about April 20, 1999, Keith Eggleton, on behalf of the defendants, sent a letter to me at Genesis in Ohio indicating that the terms of the [Agreement Regarding Advancement of Defense Costs] were acceptable. ***

***

Between April 1999 and July 2004, the defendants' attorneys sent over 140 invoices to me at Genesis in Ohio requesting payment for fees and expenses in excess of $9 million incurred on behalf of the defendants in the securities litigation and in connection with the SEC investigation. I personally analyzed the invoices, made deductions where appropriate, and authorized payment. The defendants requested advancement of more than $6 million in attorneys' fees and expenses in connection with the litigation pending against the defendants in the Southern District of Ohio.

***

Over the next four years, from April 1999 through June 2003, I received numerous telephone calls, e-mails, letters, and other correspondences at Genesis in Ohio from the defendants'

attorneys regarding the status of the Ohio securities litigation and SEC investigation, and discussing the prospects of settling the Ohio securities litigation.

The defendants, through counsel, contacted me in Ohio to request that Genesis participate in mediation, and ultimately, requested that Genesis contribute funds from the Genesis Policies toward settlement of the Ohio securities litigation and the State securities litigation. *** Between 2001 and late 2003, I received at my office in Ohio numerous faxes, letters and e-mails from the defendants' attorneys, including but not limited to Keith Eggleton and Boris Feldman, regarding the status of settlement negotiations, whether Genesis would be willing to contribute to a settlement of the Ohio securities litigation, and whether Genesis would pursue recoupment rights against the defendants.

In response to the defendants' requests for Genesis's contribution of money from the Genesis Policies towards settlement of the Ohio securities litigation, on or about June 26, 2003, Genesis and the Securities Class Action Defendants entered into a [MOU]. *** In the MOU, Genesis agreed to fund a portion of a settlement of the Ohio class action - $5.35 million of a total settlement of $11.10 million - on behalf of Lorsch, Teich, Alfi and the other Securities Class Action defendants. *** I executed the MOU on behalf of Genesis in Ohio.

\*\*\*

In connection with the negotiation of the MOU, defendants Alfi and Lorsch asked Genesis to limit their liability for Genesis's claims of recoupment.  In response to this request, Genesis also entered into a Side Agreement...with defendants Alfi and Lorsch. *** I executed the Side Agreement on behalf of Genesis in Ohio on or about June 19, 2003.

\*\*\*

I received communications from Lorsch, Teich, Alfi and/or their attorneys for the purpose of negotiating the MOU providing for Genesis's contribution to a settlement of the Ohio class action, and for the purpose of negotiating the Side Agreement to limit Alfi's and Lorsch's joint liability for any recoupment claims that Genesis might assert.

\*\*\*

> I also received numerous telephone calls in Ohio from attorneys
> Boris Feldman and Keith Eggleton on behalf of the defendants,
> from defendant Lorsch directly and from his personal attorney,
> Robert Yaspan, and from Alfi's attorney Bernard Segal
> concerning, among other things, Genesis's willingness to
> contribute to a settlement of the Ohio securities litigation,
> negotiation and execution of the MOU, and negotiation and
> execution of the Side Agreement with defendants Lorsch and Alfi.

> Later in 2003, I received several e-mails at Genesis in Ohio
> directly from defendant Lorsch concerning, among other things,
> release of Genesis's right to seek recoupment pursuant to...the
> MOU.  I also received multiple e-mails and telephone calls at
> Genesis in Ohio from Lorsch's attorney, Robert Yaspan, and
> Alfi's attorney, Bernard Segal, regarding finalizing release of
> Genesis's recoupment rights pursuant to...the MOU.  During that
> time frame I also participated in several telephone calls from Ohio
> directly with defendant Lorsch concerning the same issue.

> In or about August 2004 it became clear to Genesis that the
> defendants would not pay $2.2 million to Genesis pursuant to...the
> MOU.  Therefore, Genesis did not release its right to seek
> recoupment and, instead, filed this action to recoup the defense
> and settlement costs that Genesis paid on the defendants' behalf.

Id. at ¶¶15, 17-19, 23, 25, 29-32, 34, 35, 35t, 36-37.  Additionally, Mr. Hacala highlights

approximately twenty-five e-mails that he received in Ohio from the defendants' attorneys

regarding settlement.  Id. at 35a-t.

Mr. Alfi, Mr. Lorsch, and Mr. Teich also submitted affidavits that described their direct

contact with Ohio.  The following are pertinent excerpts from their affidavits.

### Mr. Alfi

> I have never lived in or done business in the State of Ohio or
> owned real estate in the State of Ohio, or filed an action in any
> Ohio court.

\*\*\*

9

My only contact with Ohio was that in February 1998, I participated telephonically from outside of Ohio in part of a SmarTalk Board of Directors meeting being held in Ohio.

\*\*\*

These contacts with the State of Ohio (if they can ever be called "contacts") were not on my own personal behalf but rather were either in my capacity as a director of SmarTalk. Even as a director, I never physically appeared in the State of Ohio to participate in the Board of Directors' meeting, to participate in a SmarTalk committee meeting, to participate in any negotiations, or other SmarTalk business or non-business activity. I also never mailed business correspondences to persons in Ohio or telephoned persons in Ohio for business purposes.

\*\*\*

I never owned an interest in any entity that conducted business or owned property within the State of Ohio. \*\*\*

\*\*\*

In my life, my sole contact with the State of Ohio is to have traveled to Ohio for a father son canoeing trip in 1995.

\*\*\*

Contrary to Genesis' allegation in paragraph 15 of the Complaint, I have never transacted business in the State of Ohio or committed any act or omission within the State of Ohio that gives rise to the within action.

\*\*\*

The following persons are among those individuals whom I believe to possess relevant knowledge...Boris Feldman, a partner in the law firm of Wilson Sonsini.... Mr. Feldman was the lead attorney for defendants in the underlying SmarTalk securities fraud litigation and was intimately involved in all of the negotiations that gave rise to the settlement between the parties and with Genesis. He has knowledge as to the allocation of defense costs among the securities fraud action, SEC action and

10

defense of the bankruptcy trustee's claims.*** Keith Eggleton, is a member of the law firm of Wilson Sonsini.... Mr Eggleton was the lead attorney for the defendants in the underlying SmarTalk bankruptcy trustee litigation and was intimately involved in all of the resolutions that gave rise to the settlement between the parties and Genesis. He has knowledge as to the allocation of defense costs between the disputed and non-disputed claims.

Aff. of Ahmed O. Alfi at ¶¶1, 6, 7, 9-10, 12, and 15.

Robert H. Lorsch

Since 1968, I have resided in Los Angeles County, California. I have never lived in the State of Ohio. I have never owned real estate in Ohio. I never had a bank account in Ohio and I was never a signatory on an account in Ohio. I never paid taxes in Ohio and I was never required to an income tax return in Ohio [sic].

To the extent that I had any contact with any insurance brokers or insurance companies through whom SmarTalk obtained Directors and Officers Liability Insurance policies while I was Chief Executive Officer of SmarTalk, all of those brokers or insurance companies met with me in California. I never contacted or met with any insurance brokers or insurance companies in Ohio in connection with any Directors and Officers Liability Insurance policies for SmarTalk.

***

My only activity in Ohio in connection with SmarTalk's relocation was a brief visit in February, 1998 to Ohio to evaluate the possibility of relocating SmarTalk to the State of Ohio. I conducted no other activities in Ohio in connection with the relocation of SmarTalk's principal place of business.

***

When it became apparent that SmarTalk would move to Dublin, Ohio, in February of 1998, I submitted my resignation as Chief Executive Officer of SmarTalk the very next day. After my resignation, I visited Ohio for SmarTalk's annual meeting of shareholders, which occurred in June 1998. I attended that meeting as a director of SmarTalk. I visited Ohio in connection with only one meeting of SmarTalk's Board of Directors, on

11

August 6, 1998. My only other contact with Ohio in connection with SmarTalk was my telephonic participation from California in meetings of the Board of Directors.

To my knowledge, I never owned an interest in any entity that conducted business or owned property within the State of Ohio, except for an interest in SmarTalk.

In my life, other than as otherwise related herein, I have not been to the State of Ohio other than I traveled to Ohio for one day for a reason not related to SmarTalk, more than 30 years ago.

On or about March 3, 1999, I executed the Agreement Regarding Advancement of Defense Costs.... I executed the Costs Agreement in Los Angeles County, California. To the extent I participated in the negotiation of the Costs Agreement, I was located in California during those negotiations. I received all communications regarding the Costs Agreement in California.

On or about June 18, 2003, I executed a [MOU]. I executed the MOU in Los Angeles County, California. To the extent I participated in negotiation of the MOU, I was located in California or, for three days, in Washington, D.C., during those negotiations. I received all communications regarding the MOU in California.

On or about June 18, 2003, I executed a [Side Agreement]. I executed the Side Agreement in Los Angeles County, California. To the extent I participated in negotiation of the Side Agreement, I was located in California (and Washington, D.C., as described above) during those negotiations.

Aff. of Robert H. Lorsch at ¶¶1, 4-5, 7-13. Mr. Lorsch also identifies Mr. Feldman and Mr. Eggleton as the defendants' lead attorneys involved in all negotiations with Genesis. Additionally, Mr. Lorsch identified Mr. Hacala as "the primary contact at Genesis with whom the defendants in the underlying litigation had contact concerning Genesis's advancement of any costs funding of any settlement." Id. at ¶15.

Richard M. Teich

I have never owned real estate in Ohio.

***

12

I had no contact with any insurance brokers or insurance companies concerning the negotiation of the Directors and Officers Liability Insurance Policies for SmarTalk.

\*\*\*

Beginning in March, 1998 I began performing duties as Executive Vice President of SmarTalk in SmarTalk's offices in Ohio.\*\*\*

\*\*\*

I never intended to or did move to Ohio.  To perform duties for SmarTalk in Ohio, I always commuted from Los Angeles, California.  While I was in Ohio for SmarTalk, I lived in hotels before deciding it was more cost effective to rent a corporate furnished apartment in June or July of 1998.  I never spent more than two consecutive weeks in Ohio without going home to Los Angeles.  I always maintained my residence in Los Angeles.  I never obtained an Ohio driver's license.  I never had a bank account in Ohio and I have never been a signatory on an account in Ohio.  I never registered to vote in Ohio.  I did file a tax return in Ohio for income earned in Ohio in that year.  My wife never came to Ohio.  While most management level employees of SmarTalk had bought homes in Ohio by June of 1998, I never even made the effort to establish a residence in Ohio.  Prior to performing duties in Ohio, I performed all of my duties as Executive Vice President of SmarTalk out of the office California [sic].  During the time I was performing my duties in Ohio, I would also work in SmarTalk's offices in California at all times.

To my knowledge, I never owned an interest in any entity that conducted business or owned property within the State of Ohio, other than interests in SmarTalk.

In my life, other than as otherwise related herein, I have not been to the State of Ohio.

On or about March 8, 1999, I executed an Agreement Regarding Advancement of Defense Costs....I executed the Costs Agreement in Los Angeles County, California.  To the extent I participated in the negotiation of the Costs Agreement, I was located in California during those negotiations.  I received all communications regarding the Costs Agreement in California.

13

> On or about June 24, 2003, I executed a [MOU]. I executed the
> MOU in Los Angeles County, California. To the extent I
> participated in negotiation of the MOU, I was located in California
> during those negotiations. I received all communications regarding
> the MOU in California.

Aff. of Richard M. Teich at ¶¶1, 6, 9-12. Mr. Teich also described Mr. Feldman, Mr. Eggleton,
and Mr. Hacala in the same capacity as the other two defendants. Id. at ¶14.

IV.

Specific jurisdiction is exercised over a defendant in a suit arising out of or related to the
defendant's contracts with the forum state. See Conti v. Pneumatic Prod. Corp., 977 F.2d 978,
981 (6th Cir. 1992). Under International Shoe and its progeny, the Sixth Circuit Court of
Appeals has created a three-part test to determine whether specific jurisdiction may be exercised
in compliance with the requirements of the Due Process Clause.

> First, the defendant must purposefully avail himself of the privilege
> of acting in the forum state or causing a consequence in the forum
> state.

> Second, the cause of action must arise from the defendant's
> activities there.

> Third, the acts of the defendant or consequences caused by the
> defendant must have a substantial enough connection with the
> forum state to make the exercise of jurisdiction over the defendant
> reasonable.

Southern Machine v. Mohasco Industries, 401 F.2d 374, 381 (6th Cir. 1968).

A. Purposeful Availment

The Southern Machine court called purposeful availment the "*sine qua non*" for personal
jurisdiction. Id. at 381-82. The purposeful availment requirement "gives a degree of
predictability to the legal system that allows potential defendants to structure their primary
conduct with some minimum assurance as to where that conduct will and will not render them
liable to suit." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The
requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of
'random,' fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a

14

third person.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (internal citations omitted).

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.  The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

Hanson v. Denckla, 357 U.S. 235, 253 (1958).  Accordingly, when a defendant has "deliberately" engaged in "significant activities" within the State, or has created "continuing obligations" between himself and the forum State, the defendant "manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."  Burger King, 471 U.S. at 475-76 (internal citations and quotations omitted).  When performing a purposeful avaiment analysis, it is the *quality* rather than the *quantity* of contacts that is the subject of review.  LAK, 885 F.2d at 1301.

Further, when analyzing whether a court has personal jurisdiction over a defendant that is consistent with due process, the actions of the defendant's agent are attributable to the actions of the defendant.  See, e.g., International Medical Group Inc. v. American Arbitration Association, Inc., 312 F.3d 833, 845 (7th Cir. 2002)(actions of a defendant's attorney are "attributable to [the defendant] for the purposes of personal jurisdiction analysis"); Daynard v. Ness, Motley, Loadholt, Richardson & Poole, 290 F.3d 42, 55 (1st Cir. 2002)("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal"); Sher v. Johnson, 911 F.2d 1357 (9th Cir. 1990)(same); Grand Entertainment Group v. Star Media Sales, Inc., 988 F.2d 776, 483 (3rd Cir. 1993)(action of defendant's agent used in determining whether court had jurisdiction over defendant-principal).  It is important to note, therefore, that "the relationship between client and attorney...is a quintessential principal-agent relationship."  Commissioner of Internal Revenue v. Banks, 543 U.S. 426, 125 S.Ct. 826, 832 (2005), citing Restatement (Second) of Agency §1, Comment e.

For guidance in determining whether this Court has jurisdiction over Mr. Alfi, Mr. Lorsch and Mr. Teich, this Court turns to Burger King, American Greetings v. Cohn, 839 F.2d 1164 (6th Cir. 1988), Kerry Steel v. Paragon Industries, Inc., 106 F.3d 147 (6th Cir. 1997), and Calphalon Corp. v. Rowlette, 228 F.3d 718 (6th Cir. 2000). In Burger King, a Florida corporation sued a Michigan resident in a United States District Court in Florida. The suit was for a breach of a franchise agreement. At issue was whether the Michigan defendants purposefully availed themselves in Florida during the negotiation and execution of the franchise agreement so that a Florida court could exercise jurisdiction over them. Because the suit was based on contract law, the Court stated that

> we have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' It is these factors - prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealings - that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King, 471 U.S. 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316-17 (1943)). Using these factors, the Court concluded that there were sufficient contacts so that the defendant could anticipate being haled into a Florida court.

> In this case, no physical ties to Florida can be attributed to [the defendant] other than MacShara's brief training course in Miami. [The defendant] did not maintain offices in Florida and, for all that appears from the record, has never even visited there. Yet this franchise dispute grew directly out of a contract which had a substantial connection with that State. Eschewing the option of operating an independent local enterprise, [the defendant] deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. Upon approval, [the defendant] entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of [the defendant's] voluntary acceptance of the long-term and exacting regulation of his business from Burger

King's Miami headquarters, the quality and nature of his relationship to the company in Florida can in no sense be viewed as random, fortuitous, or attenuated. [The defendant's] refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademarks and confidential business information, caused foreseeable injuries to the corporation in Florida.

\*\*\*

[The Court of Appeals'] reasoning overlooks substantial record evidence indicating that [the defendant] most certainly knew that he was affiliating himself with an enterprise based primarily in Florida. The contract documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami.

\*\*\*

Moreover, the parties' actual course of dealings repeatedly confirmed that decisionmaking authority was vested in the Miami headquarters and that the district office served largely as an intermediate link between the headquarters and the franchise.

Id. at 479-81 (internal citations, quotations, and footnotes omitted).

In American Greetings, the Sixth Circuit Court of Appeals concluded that a California defendant had enough contacts with Ohio in order to satisfy due process. American Greetings was an Ohio corporation with its principal place of business in Cleveland. The defendant was a California resident who formerly resided in Ohio and who owned both Class A and Class B stock of American Greetings. At the annual American Greetings' shareholder meeting, an amendment to American Greetings' articles of incorporation was adopted. Although the defendant did not participate in the meeting, he began corresponding with American Greetings over the legality of the amendment. Over the course of nine months, the defendant contacted American Greetings on numerous occasions in writing, by telephone, through an Ohio lawyer, and through his brother alleging that the amendment was illegal and insisting that it be rescinded. American Greetings filed an action in Ohio against the defendant seeking a declaration that the amendment was legal

17

under Ohio law.  The district court, *sua sponte*, concluded that it lacked personal jurisdiction over the defendant, but the Court of Appeals disagreed and held that the defendant's contacts with Ohio constituted purposeful availment.  The Court stated:

> it is clear to us that [the defendant] himself originated and maintained the required contacts with Ohio by his letters and telephone calls to American Greetings and by designating his brother, an Ohio resident, and an Ohio attorney to pursue his claims with American Greetings in Ohio.  In these contacts [the defendant] did much more than argue that the amendment to the plaintiff's articles was illegal.  He threatened to sue American Greetings and sought a substantial sum of money to forego his claim.  In view of these undisputed facts, we find the district court's description of [the defendant's] position in the litigation as "mere ownership of stock in an Ohio company and the expression of strong reservations concerning the legality of a matter of legitimate shareholder interest" to be inaccurate.  We find that both the requirement of minimum contacts and that of "purposeful availment" were satisfied because these contacts did "proximately result from actions by the defendant *himself*."

American Greetings, 839 F.2d at 1170 (internal citations omitted and emphasis in original).

In Kerry Steel, a Michigan steel service center, Kerry Steel, offered to sell approximately $300,000 worth of steel coils to an Oklahoma pipe fabricator, Paragon Industries.  Paragon accepted the offer by telephone, following negotiations conducted via telephone and fax.  Eventually, Paragon refused to pay the full purchase price because of an alleged nonconformity with the agreed quality standards.  Kerry Steel brought suit in Michigan federal court and the court dismissed for lack of personal jurisdiction.  The Court of Appeals affirmed, stating:

> Paragon has no employees or offices in Michigan, and there has been no showing that any Paragon employee has ever been in Michigan for the purpose of conducting business there.  It was Kerry Steel that initially contacted Paragon in Oklahoma - and Paragon responded without leaving home, as it were. *** Kerry Steel may or may not have reached out to Oklahoma, but in no way has it been shown that Paragon reached out to Michigan.
>
> ***
>
> The mere fact that Paragon entered into a contract with a Michigan

18

corporation does not mean that Paragon purposefully availed itself of the "benefits and protections" of Michigan law.

\* \* \*

It is immaterial that Paragon placed telephone calls and sent faxes to Kerry Steel in Michigan. To borrow language employed by this court in *LAK*, "[t]he telephone calls and letters on which the plaintiff's claim of jurisdiction primarily depends strike us as precisely the sort of 'random,' 'fortuitous,' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions."

\* \* \*

Not only was there no "reaching out" by Paragon to the Michigan plaintiff, we have been given no reason to believe that Paragon intended to establish "continuing relationships and obligations" in Michigan. \* \* \* The purchase agreement between Paragon and Kerry Steel represents nothing more than an isolated transaction, as far as the record discloses. There is no indication in the record that Paragon intended to create an ongoing relationship in Michigan with Kerry Steel.

\* \* \*

As in the case at bar, there was no indication of anything other than "one-shot" transaction, and it was the plaintiff who had initially solicited the defendant.
\* \* \*

What the case at bar comes down to, as we see it, is that Paragon, in response to an unsolicited sales call, ordered products from a Michigan seller and negotiated with the seller via fax and telephone to finalize the transaction. This does not constitute a purposeful availment of the privilege of transacting business in Michigan, so as to invoke the benefits and protections of Michigan law.

Kerry Steel, 106 F.3d at 151-52 (internal citations omitted).

Finally, in Calphalon, an Ohio manufacturer brought a declaratory judgment action against a Minnesota corporation in an Ohio court. After examining the *quality* of the defendant's

19

relationship in their course of dealings, the Court concluded that the defendants lacked the minimum contacts sufficient to establish personal jurisdiction. The Court stated:

> In examining the quality of the parties' relationship, we find that the actual course of dealings between the parties demonstrate that [the defendant's] contacts with Ohio were purely "fortuitous" and "attenuated."
>
> ***
>
> In this case, the agreement and previous association between [the plaintiff] and [the defendant] centered on [the defendant] representing [the plaintiff] in the states of Minnesota, Iowa, South Dakota, North Dakota, and Nebraska. [The defendant's] performance of the agreement was not focused on exploiting any market for cookware in the state of Ohio. Moreover, [the defendant's] phone, mail, and fax contact with [the plaintiff] in Ohio and [the defendant's] physical presence there occurred solely because [the plaintiff] chose to be headquartered in Ohio, not because [the defendant] sought to further its business and create "continuous and substantial" consequences there. Arguably, [the defendant] would have served as [the plaintiff's] representative in the designated states, regardless of [the plaintiff's] base of operation.
>
> ***
>
> In this case, [the defendant's] counsel sent one letter to [the plaintiff], in lieu of an impending acquisition of the company, to outline [the defendant's] possible claim for the benefit of the acquiring company. This contact is not as significant as that occurring in *American Greetings*...and does not significantly alter the nature of [the defendant's] contacts with Ohio.

Calphalon, 228 F.3d at 723 (internal citations omitted).

After reviewing these cases and comparing them to the facts in the instant case, this Court concludes that the contacts the defendants have with Ohio are more akin to those outlined in Burger King and American Greetings rather than in Kerry Steel and Calphalon.[1] Preliminarily,

---

[1] Unless otherwise stated, any references to the defendants not only include the defendants' actions but also include the actions of the defendants' attorneys as their agents.

this Court notes that no physical ties to Ohio can be attributed to the defendants other than Mr. Teich's transient residence in Ohio while working for SmarTalk. Mr. Alfi's and Mr. Lorsch's physical ties to Ohio occurred at least ten years ago and are irrelevant to the case at bar. While SmarTalk did move its principal place of business from California to Ohio, the record indicates that Mr. Alfi and Mr. Lorsch performed their SmarTalk "duties" in California while Mr. Teich operated out of both Ohio and California.

Like the franchise agreement in <u>Burger King</u>, the defendants deliberately reached out to Genesis PLM in Ohio for insurance protection in light of the numerous federal and state securities suits filed against them as directors and officers of SmarTalk. According to the evidence, the defendants sent Genesis PLM letters on at least fifteen occasions to provide notice of new lawsuits being filed against them. Perhaps more importantly, however, the defendants affirmatively contacted Genesis PLM in Ohio to tender claims filed against them and to seek coverage on their behalf. While the fifteen letters requesting coverage sent over the course of one year are not as long as the twenty-year franchise agreement established in <u>Burger King</u>, it is the *quality*, not the *duration*, of the contact that is important in determining personal jurisdiction. <u>See Calphalon</u>, 228 F.3d at 722 ("Similarly, we should focus here on the *quality* of the parties' relationship, rather than the *duration* of the relationship")(emphasis in original).

Further, the record indicates that when dealing with Genesis PLM, the defendants knew that they were dealing with an insurance affiliate based in Beachwood, Ohio. The Policy documents themselves indicated that all notices under the Policies must be sent to Genesis PLM in Ohio, and in response to the numerous lawsuits being filed against the defendants, they sent all documents to Ohio. Moreover, the evidence indicates that the parties' actual course of dealings confirmed that the decisionmaking authority concerning coverage for the securities litigation was vested in Genesis PLM in Ohio because it handles all the underwriting for director and officer liability insurance.

The fifteen letters are only the starting point when identifying *quality* contacts that the defendants had with Ohio. After notifying Genesis PLM of the lawsuits being filed against them, the defendants sought an advancement of defense costs in connection with the federal and state securities litigation. Through the direct communication between the defendants and Genesis

21

PLM, the defendants negotiated and executed the Agreement Regarding Advancement of Defense Costs. While the agreement was signed by the defendants in California, it was sent to Ohio where it was signed by Genesis PLM. Pursuant to the agreement, the defendants sent over 140 invoices to Genesis PLM requesting fees and expenses in excess of $9 million. The fees and expenses were authorized and paid from Genesis PLM.

Regarding the *loci* of the parties involved -i.e. Genesis PLM in Ohio and the defendants in California -similar negotiations occurred in the execution of the MOU and the Side Agreement. Through the course of dealings that created the MOU and the Side Agreement, the defendants contacted Genesis PLM in Ohio in order to set and define the terms, and, as a result, Genesis PLM paid $5.35 million towards the $11.10 million securities settlement pursuant to the MOU, and Mr. Alfi and Mr. Lorsch executed the Side Agreement to limit liability with Genesis PLM.

This Court views the numerous e-mails, telephone conversations, and facsimile transmissions that were originated by the defendants in California concerning the Agreement to Recoup, the MOU, and the Side Agreement to be similar to the communications at issue in American Greetings. In these communications that resulted in contact with Ohio, the defendants did much more than communicate with Genesis PLM about the extent of their insurance coverage. Rather, these were significant activities within Ohio to recover substantial sums of money to pay for legal fees and settlement costs. Put simply, these contacts go well beyond the "random," "fortuitous," and "attenuated" contacts that the Burger King Court rejected as a basis for haling non-resident defendants into a foreign state. Cf. Kerry Steel, 106 F.3d at 151; Calphalon, 228 F.3d at 722.

Kerry Steel and Calphalon are distinguishable from the case at hand. As the Kerry Steel court noted, the contacts at issue there were nothing more than an isolated transaction involving the one-time sale of goods that was initiated by the plaintiff. There was no indication that the parties sought an ongoing business relationship beyond this "one-shot" transaction. In the instant case, however, the defendants sought directors and officers liability insurance participation from Genesis PLM for *claims* asserted by third parties against the officers and directors of SmarTalk. This goes beyond a "one-shot" transaction because Genesis PLM could be potentially responsible

22

for *all* claims asserted against the directors and officers. This is illustrated by the numerous federal and state securities litigation suits brought against the defendants in which the defendants sought participation from Genesis PLM.

The Calphalon Court highlighted that the relationship between the parties centered on the defendant's representing the plaintiff in states other than Ohio. The Court noted that the defendant's physical presence in Ohio occurred solely because the plaintiff chose to be headquartered there. Unlike Calphalon, Ohio is the epicenter of the relationship shared by the defendants and Genesis PLM. The defendants chose Genesis PLM to provide them with directors and officers liability insurance knowing that Genesis PLM was located in Ohio. Abiding by the insurance contract, the defendants sought further communication and contact with Genesis PLM to obtain money for attorneys' fees and settlement costs because all decisions regarding those payments were made in Ohio. Furthermore, physical presence is not at issue in this case, which further distinguishes Calphalon.

While all of these contacts, individually, may be insufficient to establish purposeful availment, the aggregate of defendants' actions reveals a deliberate engagement in significant activities where the defendants manifestly have availed themselves of the privilege of conducting business in Ohio, and because of these activities, are shielded by the benefits and protections of Ohio's laws. Because the defendants have purposefully availed themselves of the privilege of acting in Ohio, this Court will proceed to analyze the next two prongs outlined in Southern Machine.

### B. Arising from Defendant's Activities

The second Southern Machine requirement is that "the cause of action must arise from the defendant's activities" in Ohio. Southern Machine, 401 F.2d at 374. The second criteria "does not require that the cause of action formally 'arise from' defendant's contacts with the forum; rather, this criterion requires only 'that the cause of action, of whatever type, *have a substantial connection with* the defendant's in-state activities.'" Third National Bank v. WEDGE Group, Inc., 882 F.2d 1087, 1091 (6th Cir. 1989)(quoting id. at 384 n. 27)(emphasis added). As the Southern Machine court stated: "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does

23

not arise form that contact." Southern Machine, 401 F.2d at 384 n. 29.

In the instant case, it is clear that Genesis' causes of action have a substantial connection with the defendants' Ohio activities. As stated, *supra*, the defendants purposefully availed themselves in Ohio to negotiate and receive Genesis provided insurance coverage, the extent of which is at issue in this litigation. The operative facts of this controversy are related to the defendants' contacts with Ohio.

C. Reasonableness

The final Southern Machine requirement is that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." Id. at 384. This involves determining

> whether [the forum state] has an interest in resolving the conflict at issue; but, once the first two questions have been answered affirmatively, resolution of the third involves merely fettering out the unusual cases where that interest cannot be found.

Id. at 384. When the first two Southern Machine criteria are met, "an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." First National Bank v. J.W. Brewer Tire Co., 680 F.2d 1123, 1126 (6th Cir. 1982). Factors to consider when determining reasonableness include the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. Burger King, 471 U.S. at 477 (citing World-Wide Volkswagen, 444 U.S. at 292). The Court elaborated:

> These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding

24

jurisdiction unconstitutional.

Burger King, 471 U.S. at 477 (internal citations omitted).

The defendants set forth only one consideration that would render the exercise of personal jurisdiction over them in Ohio unreasonable. The defendants argue that the insurance agreements were negotiated outside of Ohio, but, as this Court determined, *supra*, the defendants purposefully availed themselves in Ohio to negotiate the insurance policies in question and receive coverage. Further, it appears that Ohio has a reasonable interest in this case because Genesis PLM covered the expenses relating to the federal and state securities litigation, a majority of which took place in the United States District Court for the Southern District of Ohio.

### D. The Ohio Long-Arm Statute

As indicated earlier, in order to establish personal jurisdiction, a defendant's contacts with Ohio must satisfy both the Due Process Clause and the Ohio Long-Arm statute, R.C. §2307.382. That statute states, in relevant part, that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's...[t]ransacting any business in this state...." R.C. §2307.382(A)(1). As the Supreme Court of Ohio indicated

> [i]t is clear that R.C. 2307.382(A)(1)...[is] very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio. "Transact," as defined by Black's Law Dictionary..."means to *prosecute negotiations*; to carry on business; *to have dealings* * * *. The word embraces in *its meaning the carrying on or prosecution of business negotiations* but it is a *broader term than the word 'contract' and may involve business negotiations* which have been whether wholly or partly brought to a conclusion * * *."

Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc., 53 Ohio St.3d 73, 75 (1990). Because "transacting" business is such a broad statement that confers jurisdiction,

> R.C. §2307.382(A)(1) have given rise to a variety of cases which have reached their results on highly particularized factual situations, thus rendering any generalization unwarranted. With no better guideline than the bare wording of the statute to establish whether a nonresident is transacting business in Ohio, the court must, therefore, rely on a case-by-case determination.

U.S. Sprint Communications Ltd. Partnership v. Mr. K's Foods, Inc., 68 Ohio St.3d 181, 185 (1994)(internal citations and quotations omitted).

In the instant case, the defendants contend that their only contacts with Ohio were the rare and unrelated physical visits to this State when performing duties for SmarTalk. Moreover, the defendants argue that they did not "transact" business within Ohio. These arguments undermine the plain language of the Ohio Long-Arm statute, which indicates that the defendants' actions *and the actions of the defendants' agents* may be attributed to the defendants for purposes of determining whether the defendants "transacted" business within the State.

Additionally, this Court concludes that the case law cited in the defendants' motions is unpersuasive. For example, the defendants cite Reynolds claiming that the defendants in the instant case are not subject to personal jurisdiction under the Ohio Long-Arm statute. This argument is without merit because the Reynolds court failed to distinguish and separate the reach of due process with the reach of the Ohio Long-Arm statute. Reynolds, 23 F.3d at 1116 ("[T]he [transacting business clause] was intended to extend to the constitutional limits of due process..."); but see Goldstein, 70 Ohio St.3d 232 (Ohio Long-Arm statute does not extend to the reach of the Due Process Clause). Because the Reynolds court concluded that the defendants did not satisfy due process, the Court automatically concluded that the defendants failed to "transact" business under the Ohio Long-Arm statute. Reynolds, 23 F.3d at 1119.

It appears that, when viewing the defendants' contacts with Ohio in the aggregate, the defendants "transacted" business within the permissible reach of the R.C. §2307.382(A)(1). As stated, *supra*, in the defendants' attempt to obtain settlement and defense funds from Genesis PLM, the defendants "prosecuted negotiations," "carried on business," and "dealt" with Genesis PLM on a regular basis. This is more than a "one-shot" transaction between two parties, see Nationwide Mutual Insurance Co. v. Baker, 105 Ohio App.3d 336, 340 (11th Dist. 1995), or a "solicitation," see U.S. Sprint Communications, 68 Ohio St.3d at 185, because the defendants continuously sought and received coverage under the Genesis policies in Ohio.

In sum, because the three-part Southern Machine test is satisfied, this Court concludes that Mr. Alfi, Mr. Lorsch, and Mr. Teich are subject to personal jurisdiction in Ohio under the Due Process Clause. Furthermore, the defendants "transacted" business in Ohio and satisfied the

26

Ohio Long-Arm statute. The defendants' motion to dismiss based on lack of personal jurisdiction will therefore be denied.

V.

Defendants' motion to dismiss based on the doctrine of forum non conveniens is also without merit. As the United States Supreme Court stated:

> [The] transfer of venue function of the forum non conveniens doctrine has been superseded by statute, *see* 28 U.S.C. §1404(a); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253, 102 S.Ct. 252, 264-265, 70 L.Ed.2d 419 (1970), and to the extent we have continued to recognize that federal courts have the power to dismiss damages actions under the common-law forum non conveniens doctrine, we have done so only in "cases where the alternative forum is abroad."

Quakenbush v. Allstate Insurance Co., 517 U.S. 706, 722 (1996)(quoting American Dredging Co. v. Miller, 510 U.S. 443, 449 n. 2 (1994)). The instant case does not involve the transfer to an alternative forum abroad; rather, the defendants seek to transfer this case to California. Accordingly, the motion to dismiss based on forum non conveniens will be denied.

VI.

In defendants final argument in support of their motion to dismiss, they contend that venue is improper and/or this case should be transferred to California. The defendants argue that the Southern District of Ohio is an improper venue for this action. Specifically, the defendants contend that the relevant events in this case occurred in California, not Ohio. Under 28 U.S.C. §1406(a), the defendants suggest that this Court "shall dismiss" this case unless transfer is in the "interest of justice."

28 U.S.C. §1391(a) states, in pertinent part, that "[a] civil action wherein jurisdiction is founded only on diversity of citizenship may...be brought only in...a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...." In interpreting this statute, the Sixth Circuit Court of Appeals stated that

> [i]n light of the amended language of §1391(a)(2), we hold that in diversity of citizenship cases the plaintiff may file his complaint in any forum where a substantial part of the events or omissions giving rise to the claim arose; this includes any forum with a substantial connection to the plaintiff's claim.

27

First of Michigan Corp. v. Bramlet, 141 F.3d 260, 263 (6th Cir. 1998).  The fact that substantial

activities took place in one district does not disqualify another district if substantial activities

took place in the latter district, too.  Id. (citing David D. Siegel, Commentary on the 1988 and

1990 Revisions of Section 1391, Subdivision (a), Clause (2), 28 U.S.C.A. §1391 (1993)).

      In the instant case, it appears from the communications between the defendants and

Genesis PLM that the negotiations surrounding the Agreement Regarding Advancement of

Defense Costs, the MOU, and the Side Agreement took place in both California and Ohio.  The

facts indicate that the defendants made a majority of their communications through their agents

in California.  On the other hand, all of the defendants' requests, including the requests for

Genesis to cover a portion of the settlement costs and the defense fees, were sent to Genesis PLM

in Ohio and authorized by personnel in Ohio.  Further, all of the federal securities litigation was

consolidated to the United States District Court for the Southern District of Ohio, which is

undoubtedly where the defendants were using most of the money that Genesis provided them.

See Aff. of Mr. Hacala at ¶¶17-20; 29; 32.  Accordingly, while California may be a proper venue

in this case, the facts indicate that because a substantial part of the events giving rise to Genesis'

claims also occurred in the Southern District of Ohio, this Court is a proper venue as well.

      Congress has enacted several statutes that give federal courts the power to transfer cases.

See, e.g., 28 U.S.C. §1406(a)("The district court of a district in which is filed a case laying venue

in the wrong division or district shall dismiss, or it be in the interest of justice, transfer such case

to any district or division in which it could have been brought."); 28 U.S.C. §1404(a)("For the

convenience of parties and witnesses, in the interest of justice, a district court may transfer any

civil action to any other district or division where it might have been brought.").  However,

different factual scenarios are applicable to different transfer provisions.  For example, because

this Court concluded that it does have personal jurisdiction over the defendants, 28 U.S.C.

§1404(a) is the applicable transfer statute.  Martin v. Stokes, 623 F.2d 469 (6th Cir. 1980)(a 28

U.S.C. §1404(a) transfer may not be granted unless the court has personal jurisdiction); cf.,

Goldlawr, Inc. v. Heiman, 369 U.S. 463 (1962)(expressly including the lack of personal

jurisdiction as one of the procedural hurdles that can be remedied by a §1406 transfer).

Accordingly, this Court must determine whether "the interest of justice" and the "convenience of

parties and witnesses" warrants a transfer of this case to a different district.

"In ruling on a motion to transfer under §1404(a), a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public interest concerns, such as the systematic integrity and fairness, which come under the rubric of 'interests of justice.'" Moses v. Business Card Express, Inc., 929 F.2d 1131, 1137 (6th Cir. 1991)(quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30 (1988)). A forum selection clause, see Stewart, 487 U.S. at 29, or whether the transferee court has personal jurisdiction over the defendants, see Sinclair v. Kleindienst, 711 F.2d 291, 294 (D.C. Cir. 1983), are additional factors to consider when transferring a case in the "interest of justice." Other factors include:

> the relative ease of access to sources of proof; the availability of process to compel attendance of unwilling witnesses; the cost of obtaining willing witnesses; [and] the practical problems associated with trying the case most expeditiously and inexpensively. In short, the Court may consider any factor that may make any eventual trial easy, expeditious, and inexpensive.

International Car Show Ass'n v. ASCAP, 806 F.Supp. 1308, 1310 (E.D. Mich. 1992)(internal quotations, citations, and numbering omitted). With these factors in mind, however, plaintiff's choice of forum must still be given weight when determining whether transfer is appropriate. See, e.g., West American Insurance Co. v. Potts, 908 F.2d 974, 1990 WL 104034, at *2 (6th Cir. 1990) ("Foremost consideration must be given to the plaintiff's choice of forum"); Nicol v. Koscinksi, 188 F.2d 537, 537 (6th Cir. 1957) (motion to transfer properly granted when the balance weighs *strongly* in favor of transfer); Hanning v. New England Mutual Life Insurance, 710 F.Supp. 213, 214 (S.D. Ohio 1989)(same); Midwestern Motor Supply Co. Inc. v. Kimball, 761 F.Supp. 1316 (S.D. Ohio 1991)(plaintiff's choice of forum given considerable weight); cf. International Union, U.A.W. v. Aluminum Co. of America, 875 F.Supp. 430, 433 (N.D. Ohio 1995)(plaintiff's choice of forum just one factor to be considered); Neff Athletic Lettering Co. v. Walters, 524 F.Supp. 268, 272 (S.D. Ohio 1981)(same).

In the instant case, it appears that one party will be "inconvenienced" depending on whether the case is transferred to California or remains in the Southern District of Ohio. Genesis contends that the home office of the Directors and Officers Liability Insurance products, which

are at issue in this litigation, is in Dublin, Ohio. Further, Genesis contends that all of the communications and documentation involving the Agreement Regarding Advancement of Defense Costs, the MOU, and the Side Agreement are located at the Genesis PLM office. Specifically, Genesis states that

> [a]ll Genesis documents relevant to the parties' dispute, with the exception of some payment records, are located in Ohio. Genesis documents in Ohio include: documents concerning the Policies and the scope of coverage afforded by the Policies; documents concerning the negotiation and execution of the Agreement Regarding Advancement of Defense Costs, April 15, 1999 letter, the MOU, and Side Agreement; and documents concerning Genesis' damages, including but not limited to invoices for defense costs submitted to Genesis by the defendants or their representatives, and billing correspondence[s] and other records reflecting Genesis's advancement of defense costs to the defendants and funding of settlement of the Ohio securities litigation.

Aff. of Mr. Hacala, at ¶38. On the other hand, the defendants argue that all the defendants, including their attorney-agents who have relevant knowledge to the negotiation and execution of the Genesis policies, are located in California. Moreover, the defendants claim that all of the documentation related to this litigation is also located in California.

Balancing these factors in light of the "convenience of parties and witnesses" and the "interest of justice," the Court concludes that the evidence balances equally in favor of both parties, which indicates that the evidence does not *strongly* support transfer. Both parties have evidence located in either California and Ohio that would have to be transported to the district court hearing this case. Further, both parties would have costs associated with transferring witnesses regardless of where the case is heard.

Finally, it appears that Genesis PLM's office is in Beachwood, Ohio, which is located in the Northern District of Ohio. First, this Court notes that jurisdiction is proper in the Southern District of Ohio despite the fact that all communications appear to be sent to Genesis PLM's office in Beachwood. See, e.g. International Shoe, 326 U.S. at 316 (focus is whether the defendant purposefully availed himself in the *forum state*); Burger King, 471 U.S. 462, 474 (same); World-Wide Volkswagen, 444 U.S. at 291 (same). Second, this Court notes that the

Southern District of Ohio is an appropriate venue.   Neither party has argued that the Northern District of Ohio is a proper venue to litigate this case, and because the federal securities litigation was consolidated here, this Court is familiar with the parties and the previous litigation. Accordingly, giving appropriate weight to Genesis, as a plaintiff litigating in a district where the defendants are subject to jurisdiction, coupled with the fact that the evidence does not strongly support transfer, the motion to transfer is denied.

VII.

In sum, Mr. Alfi's motion to dismiss for lack of personal jurisdiction and improper venue or, in the alternative, forum non conveniens (doc. #36) is DENIED.  Mr. Lorsch's and Mr. Teich's motion to dismiss for lack of personal jurisdiction and improper venue, or, in the alternative, for transfer (doc. 41) is DENIED.

Date:  3-23-2006

Edmund A. Sargus, Jr.
United States District Judge